UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| J.P. MORGAN SECURITIES LLC, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| ANDREW C. KOLENO, | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT
(INJUNCTIVE RELIEF SOUGHT)

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against defendant Andrew C. Koleno ("Koleno" or "Defendant").

**Preliminary Statement**

1. This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that concurrently is being filed with FINRA Dispute Resolution.[1]

2. This dispute arises out of Defendant's resignation from JPMorgan on November 3, 2023, and the immediate commencement of his affiliation with LPL Financial LLC ("LPL"), a competitor of JPMorgan. According to its website, LPL is the nation's largest independent broker-dealer, with brokerage and advisory assets of $1.3 trillion and more than

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes. A true and correct copy of Rule 13804 is annexed to the accompanying Declaration of Leonard Weintraub, which is attached as Exhibit 2, at Exhibit A thereto.

22,000 financial professionals, as of November 30, 2023. At the time of the resignation of his employment, Koleno worked as a Private Client Advisor in a bank branch office of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, in Tinley Park, Illinois.

3. JPMorgan has learned that since resigning from JPMorgan and joining LPL, Koleno is aggressively soliciting JPMorgan clients to move their accounts from JPMorgan to him at LPL. JPMorgan has learned that Koleno is calling JPMorgan clients and asking for meetings or otherwise seeking to induce such clients to transfer their accounts from JPMorgan to him at LPL. The clients have informed JPMorgan that Koleno's communications have been more than simply announcing his change of employment, and that he is actively seeking to induce them to do business with him at LPL.

4. Specifically, at least six clients have indicated to JPMorgan that Koleno called the clients asking for them to meet with him at LPL or telling the clients that he could do more for them at his new firm than he could at JPMorgan.

5. One client told JPMorgan that Koleno had called the client and told him that now that he was with his new firm he could do way more for the client than he could do for the client at JPMorgan.

6. Another JPMorgan client informed JPMorgan that Koleno reached out to the client and asked the client to schedule a meeting with him because he wanted to work with her at his new firm.

7. Multiple other clients have informed JPMorgan that Koleno called them after his departure from JPMorgan and expressly asked the clients to meet with him at his new firm to discuss doing business with him.

8.     JPMorgan clients have reported that Koleno's pitch to them includes telling the clients that he can do more for them or offer them additional or better products than he could at JPMorgan.  One client indicated to JPMorgan that Koleno told the client that not only could he offer new and additional products, but also stated that the rates and return that the client will receive on certain products would be higher at his new firm than what JPMorgan can offer.

9.     It appears that Koleno's solicitation approach also includes bad-mouthing and disparaging JPMorgan and its employees.  One client who was recently contacted by Koleno informed JPMorgan that Koleno called her asking her to meet with him at his new firm.  During the call, the client indicated that Koleno told her any performance issues with her account at JPMorgan were because JPMorgan puts too many restrictions on advisors, that JPMorgan does not allow advisors the freedom to make money for clients, and that the JPMorgan advisors who replaced him after he left are right out of college and "inexperienced."  On information and belief, Koleno made these statements in a further effort to induce JPMorgan clients to transfer their accounts from JPMorgan to him at LPL.

10.     JPMorgan also has since learned that it appears that Koleno laid the groundwork for the solicitation of JPMorgan clients even prior to resigning from JPMorgan. Two clients informed JPMorgan that, approximately one week before he resigned from JPMorgan, Koleno called the clients from a different phone number than he usually called the clients on and told them that the phone number was his personal cell phone number and the clients can reach out to him on that number in the future to get in contact with him.

11.     In addition, on information and belief, Koleno took with him to LPL JPMorgan's confidential client information, including client contact information, such as cell phone numbers, which, on information and belief, are generally not publicly available, without

which he would have been unable to immediately commence calling and soliciting JPMorgan clients as soon as he resigned from JPMorgan.

12.     Unfortunately, it appears that Koleno's improper solicitation efforts have proved successful, as approximately 39 JPMorgan households, with assets totaling more than $19 million, already have transferred their accounts to Koleno at LPL.

13.     At the time he left JPMorgan, Defendant serviced approximately 500 JPMorgan clients/households (with in excess of $200 million in total assets under supervision), the vast majority of which were either pre-existing JPMorgan clients at the time they were assigned to Koleno, or were developed by Koleno at JPMorgan.  The majority of the clients serviced by Koleno have been clients of JPMorgan or its affiliates/predecessors for in excess of 20 years.  In fact, nearly one-quarter of the JPMorgan clients serviced by Koleno have been clients of JPMorgan or its affiliates/predecessors for in excess of 30 years, with some even dating back to the 1970s.

14.     Defendant's conduct constitutes a breach of his employment agreements (which contain non-solicitation and confidentiality provisions), JPMorgan's Code of Conduct (which he agreed to abide by), and a violation of his common-law obligations to JPMorgan.

15.     To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring him from further using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against him in a related arbitration that JPMorgan is in the process of commencing.

**Jurisdiction and Venue**

4

16. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in DuPage and Cook Counties, Illinois.

## The Parties

18. Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York. The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York. JPMorgan is a member firm of FINRA.

19. JPMorgan provides traditional banking, investment, and trust and estates services in Illinois through its Chase Wealth Management branch offices. Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

20. Defendant is an individual who at all times relevant herein was employed and/or conducted business in Illinois and was and is a citizen of Illinois. Defendant worked for JPMorgan in an office in Tinley Park, Illinois, and is currently a registered representative associated with LPL in its Orland Park, Illinois office. Defendant maintains securities licenses through FINRA.

21.     In connection his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration before FINRA disputes, claims and controversies arising between himself and JPMorgan.

**Factual Allegations**

22.     Defendant has been employed by JPMorgan or its predecessors since 2005.  In or about February 2005, less than two years after finishing college, Koleno commenced employment with Banc One Securities Corporation ("BOSC") as a relationship banker in New Lenox, Illinois, and, on information and belief, entered into a Supervision, Confidentiality and Non-Solicitation Agreement which contained provisions prohibiting Koleno from soliciting clients for a one period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information.  In July 2004, Bank One Corporation, BOSC's indirect parent corporation, merged with JPMorgan Chase & Co., the parent company of Plaintiff, and BOSC's operations were subsequently merged into JPMorgan's affiliate, Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer.  Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

23.     From 2005 through 2009, Koleno was a banker (not a financial advisor). In January 2010, Koleno was promoted to a Financial Advisor Associate and transferred to a JPMorgan Chase bank branch in Orland Park, Illinois.

24.     In connection with Koleno's promotion to a Financial Advisor Associate, he entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement, dated December 9, 2009 (the "2009 Non-Solicitation Agreement").

The 2009 Non-Solicitation Agreement contains provisions prohibiting Koleno from soliciting the firm's clients for a one period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information. (See Declaration of Meghavi D. Rosean ("Rosean Declaration"), attached as Exhibit 1, at Exhibit A thereto). Koleno then became a Financial Advisor in January 2012. As a Financial Advisor, Koleno would have been assigned clients and would have been responsible for helping them with their investment needs.

25.     In September 2013, Defendant was promoted to a Private Client Advisor for Chase Wealth Management, working out of an Orland Park bank branch office. In connection with such promotion, Koleno entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement, dated August 14, 2013 (the "2013 Non-Solicitation Agreement") with JPMorgan. The 2013 Non-Solicitation Agreement also contains provisions prohibiting Koleno from soliciting JPMorgan's clients for a one-year period after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information. (See Rosean Declaration, attached as Exhibit 1, at Exhibit B thereto).

26.     From in or about August 2013 through his November 3, 2023 resignation, Koleno was a Private Client Advisor for Chase Wealth Management, working out of JPMorgan Chase bank branch offices in Orland Park or Tinley Park. As a Financial Advisor and a Private Client Advisor, JPMorgan Chase referred its bank clients to Koleno in order for him to build JPMorgan's relationship with such clients. Koleno sat at his desk at the JPMorgan Chase bank branch and was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth

Management.  As a Financial Advisor and a Private Client Advisor, Koleno was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.

27.     The vast majority of the clients Koleno serviced at JPMorgan were pre-existing JPMorgan clients who were reassigned to Koleno, were long-term Chase Bank clients who were referred to Koleno, or were developed by JPMorgan at the time they were assigned to Koleno.  As noted above, the majority of the clients serviced by Koleno have been clients of JPMorgan or its affiliates/predecessors for in excess of 20 years.  In fact, nearly one-quarter of the JPMorgan clients serviced by Koleno have been clients of JPMorgan or its affiliates/predecessors for in excess of 30 years, with some even dating back to the 1970s.  Thus, JPMorgan has a near-permanent relationship with the vast majority of the clients that JPMorgan assigned to Koleno and whom he is now soliciting.

28.     JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients.  JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm.  JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan.  But for his employment with JPMorgan, Koleno would not have had any contact with the vast majority of the clients the firm assigned to him and whom he is now soliciting.

29.     As part of his official duties at JPMorgan, Koleno had access to extensive confidential financial records and information about JPMorgan's clients, including information

8

about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as LPL.

**Defendant's Employment Agreements and Obligations to JPMorgan**

30. As noted above, Defendant entered into multiple, virtually identical agreements with JPMorgan or its predecessors during his employment that contain provisions prohibiting him from soliciting JPMorgan clients for a period of one year after his JPMorgan employment ends and from using or retaining JPMorgan confidential information.

31. Section 7(a) of the 2013 Non-Solicitation Agreement (Rosean Declaration, attached as Exhibit 1, at <u>Exhibit B</u> thereto), entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

32. Section 7(b) of the 2013 Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> i. *names, addresses and telephone numbers of customers and prospective customers;*
>
> ii. *account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*

> *iii. specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*
>
> \* \* \*
>
> *vi. all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*
>
> \* \* \*
>
> *viii. information concerning established business relationships;*
>
> *ix. "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

33.     In Section 7(c) of the 2013 Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

34.     In Sections 7(d) and 7(e) of the 2013 Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

35.     In Section 8 of the 2013 Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

> *a. You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein, **you understand and agree for a period of twelve (12) months***

10

*after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.*

b.  *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Wealth Management and the Chase Private Client platforms. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with JPMS and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship model developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors. You acknowledge that by utilizing the platforms, you will be given access to confidential information and/or trade secrets, which are not readily available through any public sources and the protection of which represent a legitimate business interest of JPMC.*

c.  *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.*

36.  The 2009 Non-Solicitation Agreement (Rosean Declaration, attached as Exhibit 1, at Exhibit B thereto) contains provisions substantially similar as to those in the 2013 Non-Solicitation Agreement.

37.     On information and belief, Defendant had no prior industry experience before joining JPMorgan or its predecessors and brought no clients with him to JPMorgan. Defendant did not obtain his Series 7 securities license (which permits him to recommend for sale individual securities) until June 2009, more than four years after he commenced employment with JPMorgan or its affiliates/predecessors. In the "Attachment A" to both the 2009 Non-Solicitation Agreement and the 2013 Non-Solicitation Agreement, Koleno was permitted to identify all client relationships that he had established prior to commencing employment with JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restriction in the agreement. The Attachments A to both the 2009 Non-Solicitation Agreement and the 2013 Non-Solicitation Agreement are blank, meaning Koleno listed no such pre-existing client relationships.

38.     In Section 10(a) of the 2013 Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with counsel:

> i.    *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*

> ii.   *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*

iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving compensation associated with non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

39. In addition, in Section 10(b) of the 2013 Non-Solicitation Agreement, Defendant acknowledges that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

40. Additionally, in Section 3(b) of the 2013 Non-Solicitation Agreement, Defendant agreed to adhere to JPMorgan's Code of Conduct, as amended from time to time.

41. In consideration for entering into and continuing his employment relationship with JPMorgan and executing the Non-Solicitation Agreements, Koleno was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

### JPMorgan's Relationship with its Clients and its Confidential Information

42. During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan. JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data. Defendant had no

interaction with the vast majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan. As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

43.     A critical factor to JPMorgan's continued success is its relations with its clients. JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill. JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

44.     JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients. JPMorgan has invested substantial corporate resources to develop and maintain its client information. The vast majority of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years. JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

45.     JPMorgan also has expended significant resources to service its clients, the vast majority of whom were assigned to Defendant or referred to him by JPMorgan Chase. These resources include millions of dollars a year JPMorgan spends for support staff, clearing

services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

46.     JPMorgan employs reasonable efforts to maintain the confidentiality of its client records. Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records.

47.     The confidential and proprietary information that Defendant, on information and belief, has misappropriated was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third parties. Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release. Defendant had access to this information solely by virtue of his employment by JPMorgan. JPMorgan and Defendant are obliged to maintain the confidentiality of this information. For its part, JPMorgan took numerous steps to protect the confidentiality of this information. Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality. JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information. For example, access to JPMorgan's computer network by its professionals is password-protected. JPMorgan also limits its client information to certain employees and management who need access to such information.

48.     Employees such as Defendant must maintain client information as strictly confidential.   These instructions are confirmed in the various agreements and provisions referenced.

### Defendant's Misconduct

49.     As noted above and incorporated herein, Koleno abruptly resigned from JPMorgan on November 3, 2023, immediately joined LPL, and began soliciting JPMorgan clients.

50.     As detailed above, at least six JPMorgan clients have informed the firm that Koleno called the clients asking them to meet with him at LPL, telling the clients that he could do more for them or offer additional and better products and services than he could at JPMorgan, or otherwise solicited their business and attempted to get them to transfer their accounts to him at LPL.

51.     Koleno's solicitation of JPMorgan clients is ongoing and continuing, and has escalated to also bad-mouthing and denigrating JPMorgan during his solicitation calls to JPMorgan clients.

52.     Unless Defendant's misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

53.     Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, and unfair competition.  Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.   This misconduct is highly

disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

54.     By seeking to improperly solicit JPMorgan's clients, Defendant has and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.  Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

(a)     Loss of JPMorgan clients and loss of client confidence;

(b)     Injury to JPMorgan's reputation and goodwill in Illinois;

(c)     Use and disclosure of JPMorgan's confidential and proprietary information, including client lists;

(d)     Damage to office morale and stability, and the undermining of office protocols and procedures; and

(e)     Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

55.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 54 hereof.

56.     Defendant breached his contracts and agreements with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking JPMorgan's confidential client information.  By engaging in such conduct, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

57.     As a direct and proximate result of Defendant's breach of his contracts, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which

cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

58. JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 57 hereof.

59. As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

60. Defendant's fiduciary duty required him at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's confidential and proprietary business and client information. Defendant's fiduciary duty required him at all times to refrain from, among other things, soliciting JPMorgan's clients to join him at a competing company.

61. Defendant breached his fiduciary duty to JPMorgan by engaging in the conduct alleged above. Defendant engaged in such wrongdoing upon his resignation from JPMorgan and joining JPMorgan's competitor, LPL.

62. As a direct and proximate result of Defendant's breaches of his fiduciary duty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Breach of Duty of Loyalty)

63. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 62 hereof.

64.     By virtue of his position with JPMorgan, Defendant owed JPMorgan a duty of undivided loyalty during the term of his employment with JPMorgan.  Defendant's duty of loyalty prohibited him from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan.  Defendant's duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

65.     Defendant breached his duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of his employment with JPMorgan.

66.     Defendant knew and intended, or knew and recklessly or negligently disregarded, that his acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

67.     As a direct and proximate result of Defendant's breach of his duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
**(Intentional and/or Negligent Interference with Actual
and Prospective Economic Advantages and Business Expectancy)**

68.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 67 hereof.

69.     JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

70.     JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

71.     JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously, improperly and/or negligently interfered with and continues to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with his new firm.

72.     There was no privilege or justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, and breach of his fiduciary duty.

73.     Defendant's conduct was willful and malicious.

74.     As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**FIFTH CAUSE OF ACTION**
**(Conversion)**

75.     JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 74 hereof.

76. At all times JPMorgan was, and still is, entitled to the immediate and exclusive possession of its confidential and other proprietary information, and all physical embodiments thereof, as alleged above.

77. JPMorgan is informed and believes that Defendant took JPMorgan's confidential and proprietary information, including but not limited confidential client contact information, and converted such information for the use of Defendant and those acting in concert with him.

78. The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

79. As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**SIXTH CAUSE OF ACTION**
**(Unfair Competition)**

80. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 79 hereof.

81. Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

82. As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**WHEREFORE**, Plaintiff respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award on JPMorgan's claim for permanent injunctive relief, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of LPL, from:

(a)     soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose name became known to Defendant by virtue of his employment with JPMorgan (or any of its predecessors in interest); and

(b)     using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's clients, and/or JPMorgan's employees.

B.     Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.     Such other and further relief as the Court deems just and proper.

Dated:  January 4, 2024

Respectfully submitted,

**J.P. MORGAN SECURITIES LLC**

By: /s/ *Corey T. Hickman*
          *One of its attorneys*

Anneliese Wermuth (#6270970)
Corey T. Hickman (#6317871)
Cozen O'Connor
123 N. Wacker Drive
Suite 1800
Chicago, Illinois 60606
Phone: (312) 474-7900
awermuth@cozen.com
chickman@cozen.com